Services. Mr. Tierney, good morning. Good morning. May it please the Court, Michael Tierney on behalf of New Hampshire Right to Life. I would like to request five minutes of my time for rebuttal. Okay. This is a FOIA case involving Exemptions 4 and 5. Exemption 5 is a FOIA case involving Exemption 4. Exemption 4 allows the withholding if all three elements of the Exemption 4 test are met. Those include that the agency obtained the information from a person, that the information is privileged or confidential, and that the information is commercial information. The first part is easy because we can see that the information for these documents came from a person. The real focus should be on whether this information is confidential for the release of the documents is likely to cause substantial harm to the competitive position of the person from whom the information was obtained. In order to do this, they must first show that there is actual competition. I cite in my brief the rare case which said that if you cannot point to an unsuccessful bidder for a government grant, there is no actual competition. And just last month, August 6th, the Southern District of New York decided another case where you had, this is the case of Natural Resources Defense Council v. Department of Interior, where you had a... Is that in your brief? No, it's not in the brief. It was just decided last month. Did you file a letter? I did not file a letter because it's out of the Southern District of New York, and so it's not controlling authority. It is merely persuasive authority. I would be glad to file a letter with the citation to that if the court would appreciate it. You should have done it before the hearing so that the other side was aware that you were going to argue that case. I apologize, Your Honor. I thought that because of the fact that you had a group that was ideologically opposed to coal mining, that this would be something that is analogous to the present case where New Hampshire Right to Life is not a competitor to Planned Parenthood. New Hampshire Right to Life is not looking to put in Title X cases, just like in that Southern District of New York, you don't have an environmental group that's interested in having more coal mines. And what's really important is there needs to be an identification of an actual competitor, not just a hypothetical competitor as I addressed in my brief. The point is that if there's no actual competitor, there can be no showing of a likelihood of substantial competitive harm. It seems to me that the fact that you're here points to the fact that you are a competitor. We're not a competitor for the Title X grants. Quite frankly, my client would probably prefer if there were no Title X grants to any entity, but at the very least, we want to make sure that the taxpayers' funds are protected. The documents that have been released show that four times the cost, the pills that can be bought at Walmart are four times cheaper than the pills which HHS is paying for as part of this grant. That is the type of information that New Hampshire Right to Life wants to be able to publicize to make sure that HHS is prudently and efficiently running its department. Wasn't there a Manchester County Health Clinic that actually requested info on how to bid for this award? Absolutely. The Manchester Community Health Clinic in the summer of 2011 asked for information about what the Title X program is. When they found out information about the Title X program, they determined that they were not at all interested in this program because they're not capable of providing Title X services. In fact, subsequent to Manchester Community Health's request for information, the State of New Hampshire, Jose Montero, the Public Health Director, determined that there was nobody else who could obtain these Title X funds other than Planned Parenthood, and HHS determined in its August 18th justification memo that there was nobody else who could be awarded these funds other than Planned Parenthood. So both the State of New Hampshire and HHS, subsequent to Manchester Community Health's request, determined there was nobody else who could obtain these funds, so there's no actual competition. Why wouldn't the creation of competition, in other words, if I'm a monopolist and I have some secrets that would enable someone else to go into competition with me, why wouldn't creating that cause me competitive harm? That would be the last thing I'd want to do. Well, that gets to what the actual documents are that have been redacted with help. Stay with me, and I understand where you're going, but I'm with your point that you actually need to have current competition. I'm not quite sure why that is so. That's what my question is going at. Can't you imagine a situation in which there is no current competition, but the release of the information, suppose it was Coca-Cola's trade secret and there was no Pepsi at the time, the release would create a Pepsi with the same product. Wouldn't that be harmful to Coca-Cola, even if it were a monopolist at the time that the decision was made regarding its documents? Absolutely, if we're talking about Coca-Cola's trade secrets, but trade secrets are not at issue in this case. We're not dealing with documents that have been alleged to be the trade secret. Well, then what I hear you saying is you're abandoning the position that you have to have actual competition at the time and accepting the proposition that if it really is secret information, the release of it that could create competition could be competitive harm. That's incorrect. Trade secrets or commercial or financial information are three different types of documents. Under Exemption 4, you could withhold trade secrets. Under Exemption 4, you could hold financial documents. Under Exemption 4, you can withhold certain commercial documents, but the commercial documents, in order to withhold the commercial documents, you need to have a showing of actual competition. We're not dealing with financial documents. We're not dealing with trade secrets. And why would you assume that there could only be harm if there were presently actual competition? Because these documents are an application for federal grant funds. This is not documents submitted to a regulatory agency such as the FAA to make sure that the planes stay up in the air. These are documents requesting funding. And when you have documents requesting funding, the only potential competitors are those other people who would be requesting funding. But the standard is, I don't think the statute uses the word that there is an actual competitor. Correct. It talks about confidential that could cause competitive harm. Substantial competitive harm, likelihood of substantial competitive harm. And again, what I'm pressing on is why wouldn't the creation of a new competitor as enabled by the release of confidential documents be a competitive harm within the statute? The competitive harm would have to give an actual competitor the ability to underbid for whatever it is being. And we're not dealing with a lease, or we're not dealing with something in which the government is looking for the lowest bidder. In fact, that's part of the problem that New Hampshire Right to Life is seeking to publicize through the provision of these documents. We're dealing with a program that's trying to hit all different geographic areas throughout the country. And the six geographic areas where Planned Parenthood is operating in New Hampshire have no other competitor. Those are the only Title X clinics. So why do we have to focus on just New Hampshire? What's the state of the record with respect to whether PP&E has competed for grants of this type or similar grants, either through state, county, federal, in other instances? What's the state of the record on that? No, I'm asking just the opposite question. In Vermont, I believe that New Hampshire does not compete for Title X grants in Vermont, and I'm not aware of what the status is in May. So is PP&E just New Hampshire? It's Vermont, New Hampshire, and May. And I'm not aware of what the case is in May. Do we know whether any of the Title X grants are competitively bid and awarded anywhere in the country? My understanding is that across the country, the states that want to apply for these grants are awarded them first. There's a preference for a state or a county who then issues subgrants. And if it isn't a state or a county, there is a pre-award meeting where all the people who are interested get together, and they basically split up the geographic area. So there's no real competition. What about the subgrants? Are those ever competitively bid? With the subgrants, at least in the state of New Hampshire, there's also a pre- That's not the question I'm asking. I'm asking across the country. I'm not aware of what happens in the other states in the country. Just in New Hampshire, there's a pre-meeting where the geographic areas are. The premise of my question was why are we focusing on New Hampshire? So I was trying to get information about the rest of the country, and what you're telling me is the state of the record isn't going to tell us anything. Correct. Couldn't the district court find that New Hampshire was actively looking for alternative health providers? New Hampshire was actively looking for alternative health providers in the two-month period prior to HHS awarding this grant in 2011, and it found no one. I know, but doesn't that create a problem as to the issue of competition? It creates the record that there was no competition. The state of New Hampshire looked to try and find some competitor who did not provide abortion services and could not find any competitor to Planned Parenthood, though the state of New Hampshire had tried for a couple months. Thank you. Mr. Afram, good morning. Good morning. Seth Afram for the United States. I think that there's a fundamental flaw in the argument that we just had, which is that the only competition we care about is the competition for Title X grants. What we equally care about is the competition in the marketplace for running reproductive health care centers, because what we're talking about is PP&E's operations manual. This is the way that it runs a health clinic. That's the document that we're talking about. We're talking about the fee schedule by which PP&E decides how much it's going to charge, when it's going to not charge the full freight. That's how it runs its health clinic. There's no dispute. There's a declaration from PP&E's executive that's undisputed, that in that marketplace there is competition. There are other health clinics that operate. Regardless of whether they see Title X funding as part of their funding stream, they run health clinics. And to be given the blueprint of PP&E and how it runs its health clinic, to be given PP&E's fee schedule would give those entities that already exist an advantage to see how their competitor is doing business. That is substantial competitive harm. There are actual competitors. And the flaw in the argument has always been this myopic focus on, was there competition in 2011 for a Title X grant? I don't see how that's the question really at all. You could answer that question, but I think it's equally fair to say there's competition in the health care marketplace. These documents harm PP&E potentially if they're released on their advantage in running those health clinics, and that's sufficient to invoke Exemption 4. Is some suggestion in the briefs that HHS changed its position on the manual? HHS, the procedural history of the case is HHS indicated, as it was opposed to, that it was going to disclose a larger portion of the manual because PP&E essentially had not sufficiently identified which parts of it would cause it harm. PP&E brought what's called a reverse FOIA. As a result of the reverse FOIA, HHS asked the district court for a remand and asked PP&E to submit additional information about which parts were confidential, could cause a competitive harm, and which parts couldn't. PP&E submitted more information to HHS. HHS then looked at the manual again and released parts of it. So the entire manual was not withheld. Portions of it were withheld based on the additional information that PP&E provided as part of that reverse FOIA action. So HHS stands in the middle here between Right to Life on one side and PP&E on the other side about releasing this manual, and in the end it released parts of it. So that's the procedural history that brings us here. Did HHS identify any actual competitors, including in the markets that you've pointed us to? The undisputed evidence, by name, I don't know that the declaration contains the names, but the declaration that's undisputed from PP&E's executive director says that in the healthcare marketplace there are community health clinics in New Hampshire with which they compete. So you're referring to the read affidavit? I am. And so that read affidavit, I think it's on, what, the second page? So that's the entire justification for protecting the manual? That's the justification for saying that the portion of the manual that were redacted would potentially cause competitive harm to Planned Parenthood. What about this concern? I don't know of a single company or operation that has something that it thinks is confidential that would not claim it could be harmed by a competitor if the competitor had it. And I assume HHS would want something more than just the assertion from the possessor of the information. I mean, some of it's common sense, I think. I mean, there's a discussion about what it is. Someone's how we charge, right? What price do we charge? And in what circumstances will we forgive a charge that we've provided, right? That's the kind of information I think common sense says businesses want to guard because if everyone knows when we're going to cut a customer a break, that's the kind of information that I think common sense says businesses would want. The manual, there is a discussion in that affidavit about what the manual is and that it is medical procedures and protocols, ways of doing the work that PP&E, that Planned Parenthood of America, as the declaration explains, has spent lots of years putting together. I mean, that's the fundamental blueprint. Could you imagine some, you know, for example, Judge LaPlante rejected the personnel policies. And I understand his point there. You could imagine that those don't go as much to the core of the business succeeding. You know, how much vacation do we give? You know, you could argue they do, but they're removed. And Judge LaPlante didn't accept that argument. And what do you say to the point that is the position HHS is taking here preventing the public from knowing what the federal government is paying for, what it's being charged for, medications, services? Yeah, I mean, I've never, frankly, Judge, I've never really understood that argument. I mean, this is a document about the kinds of services that PP&E provides and how they provide it. What's the fee schedule? The fee schedule, so ask me, sorry, ask me the question once more time. Does it hide what the government's paying? Yes. In other words, the arguments that I think I just heard from opposing counsel is the suggestion that the DHS, the HHS position here is effectively keeping the public from knowing what the government is being charged and that they're, in fact, maybe being charged much higher rates than you could get stuff elsewhere. I mean, the only thing that I understand about that argument is that the claim is that the charge for, that HHS charges for a pill is higher than it can be purchased at Walmart. But, I mean, I think you could say that every time you go to a doctor's office probably. I mean, I'm not sure that that really gets us anywhere, that you could get it cheaper somewhere else at Walmart. I don't know that that really gets to anything other than it's rhetorically appealing to say that. But, no. But as to that point, I thought that when the state of New Hampshire decided not to award the grant, there were concerns along those same lines which led me to question what was already in the public record in the state of  Do you have any idea what PP&E might have filed in its charitable trust registrations in Vermont, New Hampshire, and Maine? Is there overlap there? That I don't know. As to why this happened, my understanding is that the Executive Council's position was that PP&E was not following the Title X restrictions on using funds for abortion-related services and that that was the reason. Yes, I do remember reading that, but I thought also there was a cost question that was raised, which would seem to me to have to come from something that was filed with the state. And it may not have been a public document. I think the Walmart issue came from a document that was released as part of this litigation. By the way, lots of documents were released by the department in this case. And I do believe that that issue arose from something that was released is my recollection. So let me turn from Exemption 4 to Exemption 5, which is the deliberative process issue. And what underlies that, what I think the real dispute here is, what is the decision that's at issue? And the right to life treats it as if there were one decision. Now, it gets the date wrong for that decision, and it says that the date for that decision was August 10th. But this is government decision-making, and there are multiple decisions along the way that a government agency makes when it's deciding a complicated problem like this. So decision one is, do we have a sole source grant at all? Should we have a non-competitive bid given this unusual situation we find ourselves in? The government needs to decide, should we do that or shouldn't we do that? That happens August 19th. September 13th is when the government decides, okay, on August 19th we've decided we're going to do a sole source grant, and now on September 13th we decide we are actually going to issue that grant to PP&E. In the meanwhile, there are other decisions the government makes. We are going to need to publicize this. How are we going to do that? Are we going to do that via a blog posting, a press conference, and government officials discuss, what should our communication strategy be about this decision? These are all different government decisions that require lower-level government officials to communicate with higher-level government officials. So to paint with a broad brush and say there was one decision, which Right to Life wants to treat as the decision to proceed in a sole source grant model as the only decision, I think is fundamentally wrong. And once you get past that, you see that each document that's in dispute is pre-decisional to a government decision that's outlined in my brief. And so I think that that's the way to focus on the Exemption 5 Deliberative Process question in the case. Let me ask you one question about that. As I understand it, it's August 19 memo. HHS itself volunteered that it had consulted with the Office of General Counsel and that OGC had determined that it was legally justified what HHS was doing, that issuing the replacement grant was legally justified. Right. So that gets to the question. So we've said that the reasoning of the OGC is protected by the attorney-client privilege. And the question would be, in that memo, did the department adopt the reasoning of the Office of General Counsel? Because, and I'll point the court to the Brennan case decided by the Second Circuit, and in that case, the Second Circuit said, in the memorandum, the government agency said, consistent with guidance from the U.S. Department of Justice, the agency would now proceed in a certain way. And the question was, by saying that we, that consistent with legal advice we got, we are going to do X, does that mean that now the government has to release the reasoning behind the lawyer's recommendation? And the Second Circuit said, no, because mere reliance on the conclusion reached by the lawyer doesn't ordinarily mean that the government has adopted the reasoning of the lawyer. The Keith memorandum sets forth the government's reasoning. It talks about the manual that sets forth why they can do a replacement grant, and it provides, it puts the text of that, and it provides that that's the basis. It then says, and we've consulted with general counsel, which agrees that it's legal. So we are acting consistent with that. That's very much what at page 206 of the Brennan case says is not enough for the kind of adoption or expressing corporation that's required for release to essentially waive the attorney-client privilege. I mean, generally, for example, in civil litigation, if I raise a defense and I said, whoa, my legal counsel told me this was justified, I've waived the defense. That's right. So if you said that the reason I've taken this course of action is because of what my lawyer told me, I agree with you. Well, but when HHS volunteers, and I wasn't dragged out of them, they volunteered that what we were doing is legally justified, and yet they're now saying the public cannot test that assertion to see if they say counsel told us it was legally justified, and you're telling us no one in the public can test the accuracy of that assertion by HHS. I think where HHS, I think the distinction I would draw is that HHS provided its reasoning in the memorandum itself. It didn't just say we are doing this because the lawyers told us to. It's saying we're doing this because this manual says we can, here's the language, here's what says we can, and that's what we're doing, and we consulted with the lawyers. And the lawyers told us it was legally justified. And the lawyers. That's the part. When you take that, it seems to me they added that. They could have just said we think we can do it. Here's our reasoning. We think it's legally justified. They could say all those things, but they obviously wanted to get a bit more mileage and credibility to what they're saying by saying, and by the way, we actually checked with OGC, and OGC, we're volunteering to tell you, told us it's legal. And you're now telling us that the public cannot test the accuracy of that statement. And I would say because that, I mean, I've really told you why I think that's so, because the line that's at least been drawn in the Second Circuit, where this has been most developed, is conclusion versus rationale, that adopting rationale is what brings it over the line. And here, where the agency gives its own rationale and says the lawyer's conclusion is the same, is not enough. But I do understand your point. But I take it that part of the reason why you're saying that is that the memorandum from legal counsel may cover a wide range of issues, including balancing all kinds of things that went into deciding this issue, most of which would not be discoverable. It's just the final conclusion that's discoverable, and that's already been released. The conclusion's been released, and that could have all sorts of different legal discussion going on in it. In fact, what 11 says, Category 11 is what we're talking about. What Category 11 says is it's an e-mail from an OGC attorney to someone in another part of HHS, giving that lawyer's advice. Based on what the bond index says, it's not even clear that's the OGC opinion. So I think that's problematic as well. Thank you, Judge Stray. Just picking up on that same issue, Attorney Afram and I agree that Brennan talks about this issue, but I disagree with the conclusion of Brennan in the Second Circuit. I think the Second Circuit is clear in the Brennan case that when you have a reference to an OGC opinion, that that waives any privilege. In fact, Second Circuit says that when an agency determines there is advantage by referencing a protected document as authoritative, it cannot shield the authority by which it relies from disclosure. And in the Second Circuit, that passing reference was enough for the Second Circuit to order the disclosure of the attorney-client-privileged opinion as to what was referenced in the public document. And we would ask the Court to do the same here. It's important to remember that for deliberative process privilege, all that gets shielded is what is determining agency policy. And if you look at the Vaughn Index, you just look only at the Vaughn Index. The Vaughn Index discusses that the decision made on August 18th, August 19th, was to award this grant to Planned Parenthood. The justification memo that was signed on the 19th says that it is the intent of HHS to award this to Planned Parenthood. You have a number of other references in the produced documents that I cite to in my brief saying the decision was made to award this not just to somebody to be determined in the future, but to award this specifically to Planned Parenthood. And everything that happened after that date, and it's clear from the Vaughn Index, was how are we going to let the public know about our decision? How are we going to spin this so we have the least political fallout? And that is clearly not protected by the deliberative process privilege. In the Texco decision, the First Circuit of this Court said that discussions of how to justify decisions already made are not protected by the deliberative process privilege. And so all of those categories discussing how to spin the decision that HHS already made are not protected by Exemption 5. So you're saying the government, you're saying it would never be a decision from which it could be anything pre when what we're referring to as the decision is the deliberations within the government as to whether or not it should notify the public of something. Correct. Categories 1 through 14 are all protected by the deliberative process privilege, and we don't challenge the government's assertion of the privilege for categories 1 through 14. So if the government, if they were deciding at NOAA, should we issue an alert to the public on whether this is a hurricane or a tropical storm, you would say, and they have a meeting and they have a deliberation and they decide to issue a publication, a notice to the public of what they're finding about the storm. That's not a deliberation under your rationale. It is not a deliberation on how to notify the public and what should be told to the public. Correct. It's only agency policy. And the Texaco decision is right on point on that. The agency actually cites an unpublished decision from the Eastern District of Missouri, which to the extent it's persuasive in that case in discussing the public relations strategy, they also discussed how they came to the ultimate conclusion. And if there are, you know, discussions of how you come to the ultimate conclusion developing that agency policy, those could potentially be covered by deliberative process privilege. But when you have the discussions which are solely geared toward discussing what the public relations strategy is going to be, that's not covered by deliberative process. I have looked at the charitable trust filings for Planned Parenthood, and interestingly for 2011 and 2012, they don't report the government grants that are at issue in this case. They report a total of $30,000 in government grants. And so my clients are looking into that and trying to figure out how that math works, but there was nothing in the charitable trust that really seemed to be applicable in this case. So they don't have to file their fee schedules. I assume they have to file their salaries of the top executives, that sort of thing. Correct. But fee schedules and types of services provided, that stuff doesn't get filed. Not with that level of specificity. The salary schedule was one of the reasons why the New Hampshire Executive Council did not award the grant because of the excessive salaries that are being paid for with the Title X grant. Is this all on the record? This is all on the record, yes.